The Millennium Health LLC is a partnership between the U.S. Department of Health and the U.S. Department of We will call our next case. I'm sorry. Some static on the line, but good morning, your honors. May I please court? My name is Philip. I'm here on behalf of the plaintiff. I'd like to reserve four minutes for a while. Defendant Millennium Health is a. It sounds like somebody has the YouTube still running in the background. I heard that, too. Sorry, your honor. Defendant Millennium Health is a laboratory that sells medication monitoring and drug testing services. Plaintiff is a doctor's office that has used those services in the past. An issue here is a fax. Millennium sent its entire contact list as part of a self-described workers compensation push to increase doctors usage of its medicare medication monitoring service in the treatment of injured workers. The fax was unsolicited and it did not include an opt out notice. The district court decided the fax was not a T.C.P.A. advertisement because it merely promoted an educational webinar. District court explained the fax doesn't connect Millennium to medication monitoring or mentioned that Millennium sells medication monitoring. Plaintiff contends the district court erred by refusing to consider the context in which the fax was sent, that it was only sent to Millennium's business contacts, that the webinar would be about the superiority of Millennium's service to other forms of testing, and the court refused to consider what was said in the webinar or how it was presented. So this case really tees up for us an interesting question that emerges from our cases about how we go about defining an advertisement, right? Our cases, sometimes within the same case like Optum, are looking to the perspective of the reasonable recipient or to the intent of the sender. And the answer may be different in this case depending on which of those perspectives we take, whether this was advertisement. So speak to us about which of those is, given the import of the T.C.P.A. and what it's designed to achieve, which test is really the right test for an advertisement? Well, in our brief, we argue that those tests really sort of merge together. In a situation like this, Millennium's customers are probably the insurance companies that pay for these tests in workers' comp scenarios, but they need doctors to prescribe them. So they decided they needed to educate doctors about the need to use the tests and how it would be useful to use them in the treatment of their patients. So they don't actually need to tell the doctors, we have a discount on our test. It's five tests for $10 or something like that. They need to educate them about the reasons to use them. And so this is an advertisement both to the doctors themselves to use it, but also so the doctors will convince somebody else that it was medically necessary. In fact, that was something discussed in the webinar was how to explain the medical necessity to the insurance company payer that you're getting this better test, more expensive test. Well, it's not hard to see if you're looking at the intent of a sender that ultimately there would be a desire to cause a specific purchase. But if we are using a recipient test, the way we've talked about recipient tests in our case law would really require the communication to be announcing the opportunity for some kind of exchange. Right? Right. And here the fax doesn't do that. It's more of a reminder, Your Honor, to people who already know Millennium. It's a reminder that the service is available, and it's about why you would want to use it in a particular scenario. But if that's the test, if it's just enough to be a reminder, that would be any fax that had the name of the company, the logo of the company. Right? And we know that the TPP... Right. But this one goes further because it actually identifies the product. It doesn't identify it by name. It's not just a letter from Millennium. It's not a bill from Millennium. It's not a Christmas card from Millennium. It's a fax about the service Millennium sells. Well, wait, wait, wait. I don't know that... I mean, it's a free webinar. So, I mean, the question... I mean, the TCPA, as I understand it, doesn't prohibit all advertising by fax. It certainly doesn't do that. It only prohibits unsolicited advertising. And unsolicited advertising takes a kind of narrow definition of advertising. It's not the universe of advertising. It's, quote, material advertising the commercial availability or quality of any property, goods, or services, quote. And so I guess my question is, how is an ad for a free webinar advertising the commercial availability or quality of properties, goods, or services? A webinar is not properties or goods. Maybe it's services. But they aren't commercially available. It's free. So it strikes me that under this test... Not test. The statutory definition, a free webinar doesn't meet the definition of the statute. They've got an FCC rule that may take a different approach on that. Right. But don't you have a real problem here that a free webinar itself is not advertising commercial availability or quality of properties, goods, or services? Well, Your Honor, I think I understand the question. But, you know, first of all, the fax doesn't actually say it's a free webinar. It says it's a webinar. And it's a webinar about Millennium's commercially available service. And it talks about the webinar will be about their service and about the quality of their service. Let me just add, this is a hypothetical, and this is a follow-up. Let's just say that this is the old days of, like, big catalogs. The catalogs have gotten smaller now. But in the old days, you know, some people used to make their holiday list based on what came in the big catalog. Let's say there was a fax and it said, we, a department store, have a great seasonal catalog. It's free. You know, just, you know, let us know if you want it. Would that be a junk fax in your estimation? Because clearly the catalog is trying to sell things. But the fax itself is just saying, we've got a free catalog for you. Let us know if you want it. Would that fax for basically saying, hey, we've got a free catalog, let us know if you want it, would that violate the TCPA? Yes. Yes. Because even though it doesn't identify the products by name that are in the catalog, it's identifying the catalog. And it's talking about the quality of the goods that are in the catalog. Okay. Let me push a little more. And I'm just going to keep, I'll quit pushing after this. Let's say they send a fax and says, we have available on our website an application for a free catalog. So now we've entered another layer. The catalog, we have a free catalog, the application, but we just are faxing you about the application for the free catalog. Is that now that we've added another layer between the catalog that actually would be the advertisement to the free catalog, the free application, and a fax just letting you know that we've got a free application for the catalog. Is that going to violate the TCPA? You know, probably under the pretext view of, you know, what is this fax doing? It's not non-commercial. It's not non-advertising. So I guess it requires the adoption of the pretext test in order for that, for these faxes to violate the TCPA? Is that what I'm hearing? You know, not necessarily because I don't know that there is a pretext test. I think the pretext view is more of just a common sense view of what is the fax. You know, this fax ostensibly is for a webinar about something, but it's important to know who it was sent by, who it was sent to, what is the webinar about, what is the webinar going to be about. You know, we used as an example Tesla sends a fax about a free webinar about the benefits of electric cars versus gas combustible engines. That's an ad for Tesla, even though it doesn't say Tesla vehicles are on sale for $30,000. Or maybe even that the free webinar doesn't say you can buy a Tesla vehicle for $30,000. But Tesla sells electric vehicles, people who receive the fax know, and a jury could reasonably conclude that it is an advertisement for Tesla vehicles. Well, it's an advertisement for a category of products, right? Yeah. You can make the further leap if the company in question has cornered the market on those products. But, you know, if as here, to the extent it relates to a category of products, there are many others in the marketplace. Then when we look to the definition of advertisement under the statute, we're looking to the material that is being transmitted, that is, the face of the fax itself. Does that really qualify as advertising commercial availability or quality of the products, goods, or services that are transmitted to the person? In this case, it does. If this fax were sent by a company that does not sell medication monitoring tests, you know, say Narcotics Anonymous sends out a fax that says, you know, let's have a discussion about why people's urine should be tested to see if they're using opioids. You know, that doesn't have a commercial purpose. This fax has material advertising Millennium's service. Millennium is in the business of selling the service, and they send the fax only to people who have done business with them in the past. And the seminar is going to be about the value of using their service. Well, it's on its face to the extent it relates to a category, it's the value of that general product. When we look here at the face of the fax, there's nothing as to any specific products of the company. No product is named, but it is their specific product that's going to be discussed. And here we're taking Judge Fitz's hypothetical a step further. What they're advertising for, that is the seminar. At the seminar, also, there was no reference to particular products of the company, right? And also to any of those in attendance to solicit them to purchase a particular product. Actually, their product was mentioned in the webinar. I mean, ignore for the moment that every single slide had their logo on the top. But in the notes that they handed out, the handout, in the notes, it talks about Millennium's specific test, LC-MS slash MS. And the webinar was about how that particular test is better than the IA test or the other kind of test, both in terms of not having false positives and being faster. And they give an example of somebody named Brad. And if you use this other test to test Brad's urine, you're going to decide that he's using THC instead of opioids. But if you use the test we sell, and they actually say Millennium's test. Well, maybe I'm mistaken, but I thought on the record that the notes were for the doctor who's giving the presentation, not that those notes were provided to everyone in the audience. My understanding, Your Honor, is that that was a handout to the people who participated. She references looking at the handout. I'm sorry. Ms. Cianca. The presenter. Right. Yes, the presenter, yeah. And then, of course, once the webinar was put on the website, it was two-thirds of the page was the slides, and the other third was the ad for Millennium's UDT product, and a description of its benefits that exactly matches the benefits in the slides. Is there an image of that in the record? Yes. I can give you a site, Your Honor. Sorry. Let's see. 391 talks about the short turnaround time of the Millennium product, and lower on the page it says LC-MS, MS is the most sensitive and most accurate. That's 391. Turnaround time with Millennium Health LC-MS, MS testing is one to two business days. And during the transcript of the webinar, the speaker defines their test, that form of test as the definitive test as compared to the lesser forms of testing. I mean, you know, I guess it's a subtle form of advertising because they're speaking to doctors. They already know what they sell. They know what they're talking about, and they're explaining the benefits of their product. They don't have to hand out T-shirts that say Millennium UDT test. It's Millennium putting on the seminar talking about the benefits of the test they sell versus the test other people sell, and they don't hit them over the head, you know, like maybe it would happen in more of a consumer context of a, you know, or with strangers. What authority do you have for the proposition that soliciting for a category of products without reference to the particular product of the sender qualifies as an advertisement under the TCPA? I mean, you know, does the TCPA require an advertisement have the brand name? It doesn't. The words don't say that it does. Any property, goods, or services? Does it have to say if it's going to be for real property? Does it have to have the address, or can it just say we sell real estate? Sorry, Your Honor. No, it's so tied, though, to commercial availability or quality of property, goods, or services. I mean, I don't know that a free webinar is commercial. Do you think a free webinar is commercially available? Well, again, the fact doesn't even say the webinar is free. It just says there is a webinar, and it tells you what it's going to be about, and it's going to be about a commercially available product, and the fact does describe the quality of that. It uses the word value four times. It says Millennium Health multiple times. It says the person giving the presentation will be the person who educates people about utilizing their service. But I think that might get to Judge Krause's point, is if you hype a company, right, if you hype a company, are you hyping property, goods, or services? Because you're hyping the company. When the company is well known. We're the best company for these products and services, but you don't mention those services. And so I guess my thought is, I mean, I guess I suspect what your point would be is all this is naive to the real purpose of advertising. The statute does say not just self-promote your business. It has to relate to something a little more specific, property, goods, or services. I mean, I agree. I think the Goodyear blimp is an advertisement for tires because people see it, and they know who Goodyear is, and they know that the tires, and that's what it's doing. I mean, look, if someone just sent an unsolicited fax of a picture of the Goodyear blimp, is this a violation of the TCPA? Because it doesn't talk about any specific tires, property, services. It doesn't talk about the commercial availability. I mean, there's a reason, though, to your point that people name stadiums after certain brands, all that advertising at one level, but the TCPA doesn't seem to, at least as I read it, prohibit all advertising by fax, only the commercial availability or quality of property, goods, or services. And so it's into that latter step that to have a case, you've got to make it. But I am still interested in that. Before I gave that addendum, I'm interested. Is a fax picture of the Goodyear blimp violate the TCPA? I mean, a fax from Goodyear sent to people they know need tires. You know, it's any material advertising, any material. The FCC has said a logo can be an advertisement. I know we're not going to follow what the FCC says, but they're speaking, I think, from more of a common sense. I think it's a spectrum. This wasn't an innocent advertisement. We're not accusing them of sending a fax that just happens to be advertising. The purpose of sending it was a push to doctors to use their service. That's the point of it. I was interested in Judge Fitz's question. And specifically in my case, how? How did the fax communicate commercial availability or quality of any property, goods, or services? Because Millennium Health sends doctors who already know Millennium Health. We're talking about, generally, what happened in this case? Because the fax is about the value of medication monitoring. And that's what Millennium sells, medication monitoring. It says it's going to discuss the role of medication monitoring as a valuable tool providing objective information to doctors. Was there a specific product mentioned in that fax? Um, you know, specific product. I don't, you know, if you mean by specific product, the brand name. I mean, they have a specific product that's called Millennium UDT. And that just stands for urine drug test. Okay. I guess maybe I should ask a question more specifically. What did they advertise for sale in this presentation? Their drug test. The value of using the test that they sell. Now, did they mention the product by name? I'm not trying to be difficult, Your Honor. The product doesn't really have a name. It's not called the 652 or something like that. So, it needs to say 652. They say medical monitoring test. And that's what they have. Now, it doesn't say the name of the test, but that's what they sell. That's in the webinar, though, not in the fax, right? The webinar specifically says Millennium Health LC-MS-MS. But the fax itself says Millennium Health five or six times. And it talks four times about the value of medical monitoring. You know, I don't know, but have they figured out a loophole? Like, you can do sneaky advertising as long as you don't mention the products by name. Then you can send it. All they had to do was either have permission or an opt-out notice. And they don't violate the prohibition against sending unsolicited advertisement to people's fax machines. TCPA requires companies in sending a fax to include their name, right? You're supposed to identify the sender in the top. There's no requirement that you include your logo. But your theory would essentially convert every fax from a company into an advertisement under the TCPA, wouldn't it? No, no. It would mean this fax is an advertisement. Well, it sounds like your theory is correct that using the name is enough to remind people that that company sells products. And there's therefore the development of goodwill and hope for an eventual sale that makes that document qualify as an advertisement. But if that's enough, given the requirement of the TCPA that a company include their name, then every fax under the TCPA is going to qualify as an advertisement, isn't it? No, no. You know, a fax from Hewlett Packard that says, remember to check the toner cartridge in your printer. They don't have to say that the particular printer, the particular toner cartridge, but it's an HP fax about toner cartridges, and that's what they sell. That's advertising. Mr. Koch, the district court specifically said that this was not an advertisement. The commercial availability or quality of any property, goods or services was not mentioned. Right. So how was this an offer to sell? It's not an offer to sell, it's a reminder that they sell it. It's a reminder to use it, and it's a communication that tells you what they sell is valuable to you and your patients. So, I mean, I guess the real question, I mean, the real thing, I mean, I mean, the tension of your case, we'll hear from you on rebuttal. I'll just I'll just tell you what I'm struggling with. I'm struggling with the definition of unsolicited advertisement. Because it says means any material advertising the commercial availability or quality of any property, goods or services, which is transmitted to any person without that person's prior express invitation, permission or writing or otherwise. Now, if it was just any material, any advertisement transmitted to a person without their express invitation, permission, writing or otherwise, what you say makes a lot of sense. But there's these intervening lines and the intervening lines say advertising the commercial availability or quality of any property, goods or services. And so it's not just any advertisement. And I think you've convinced me that advertisements is a big, big, big space. But if it was just any advertisement, Congress would have just said means any advertisement transmitted to any person without that person's prior express invitation, permission or writing or otherwise. And if that's what the statute said, I think you've got an easy case. But that's not what the statute says. The statute has an additional, I'm ballparking it, of 10 words. And it's those 10 words that are the speed bump that I'm facing with your case because we have to find out commercial availability, quality, property, goods or services. What do you think? Do you want to address that on rebuttal or do you want to try to fit your case into those 10 words? I mean, quickly, I think that that definition is broader than just saying the word advertisement. It doesn't have to be an advertisement. It has to contain any material advertising either the commercial availability or the quality of any property, goods or service. So any material advertising the quality of any service is an advertisement for which you need permission or an opt-out notice to send by fax. That's all. All they have to do is include an opt-out notice. Doesn't this go back to whether you're looking at this from the perspective of a sender or recipient? To extend our cases, look at it from the perspective of a recipient. We've talked about the requirements that give the impression that the sender is trying to make a sale. And looking at a document that talks about even a general category of products or the good deeds of a company or a free seminar offered by a company. How does that convey to a recipient that the company is trying to make a sale? I mean, that seems like maybe a jury question is, does this fax convey to doctors who receive it that Millennium is trying to encourage them to buy their service? Their medical monitoring service. They tell you why you need to use it. You know they sell it. They send it only to people they know are in the marketplace for that stuff. And they sent it because of those reasons. That's why they sent it. And the TCPA doesn't say there's anything wrong with that as long as you have either permission before you send it. You call them up and say, hey, can I send you a fax about interesting free webinars we have about our product? Or you just put an opt-out notice at the bottom that tells people how to make it stop so you don't get any more. You can send one free to everybody you've ever done business with as long as you're an opt-out notice. The only reason we're having this debate is because they didn't do those things. They didn't have permission. They didn't put an opt-out notice. I don't know why. And I also don't know why it doesn't just say in the corner that you can get these tests for $7.99 or something like that. But maybe that's not how you advertise to doctors. I don't know. All right. Well, why don't we come back to everybody. Thank you. Thank you. Good afternoon, Judge Krause, and may it please the court. Paul Warner on behalf of Millennium Health. I'd like to start with a specific area of confusion and then work my way back into the broader conversation that we're having. With respect to the discussion around what was provided to those folks who actually attended this webinar, that is at JA-120 and JA-316. It did not include the speaker notes. There was not a handout. It was simply a webinar. And you all have taken a look at by now the slide deck that was put on the screen for those folks who attended the webinar. There was also discussion of a declaration that was submitted into the record by plaintiff's counsel in support of their opposition to our motion for summary judgment. Which really crystallizes, in this case, the issues around the pretext theory. The declaration takes a look at what Millennium's website looks like two years after the webinar was actually presented. And the discussion of the sidebar that references Millennium's product, that was not available or seen by anyone who participated in the webinar. That was only as of 2019, two years after the webinar, deep into this litigation and after discovery had, in fact, closed. And it really demonstrates the through-the-looking-glass-eye-of-the-beholder approach that the pretext theory reduces to if the court were to accept it. Because, as Judge Krause, you noted, any commercial entity operates essentially from a profit motive and any industrious plaintiff or any industrious plaintiff's counsel can turn any sort of informational communication into a prohibited TCPA violative communication, which is a problem because May I ask, in that same light, your client didn't just want to be good folks. They had a purpose in the webinar. Did they not? They did have a purpose, Your Honor, and it was educational, and that's clear from the face of the facts. As the TCPA provides, the relevant consideration for what is or is not an advertisement is the material transmitted, and it must be an advertisement of something that's commercially available. Here, the webinar was an educational discussion around current issues with the misuse of opioids, the landscape for use of opioids to treat chronic pain, risk factors in the use of opioids to treat chronic pain, and specific guidelines relevant to the use of opioids to treat chronic pain in the workers' compensation setting. Was any product at all, any commercial product mentioned in the webinar? No, there was no discussion of any Millennium Products, good or service, during the course of the webinar. There was generalized reference to urine drug testing as one component of a risk mitigation plan to deal with the risk factors that present themselves in the workers' compensation setting. So, the discussion of urine drug testing, which, as Gerald Krauss rightfully points out, Millennium certainly has not cornered the market on. There are many competitors, many companies that offer that type of service. The discussion of urine drug testing generally was in the context of an educational presentation on risk factors and mitigation techniques to use to deal with misuse, abuse, and diversion of opioid drugs in the workers' compensation setting. So, in short, could you tell me what the purpose of Millennium's webinar was? To provide an educational opportunity for clinicians on recent developments in the workers' compensation setting. You're saying no product was promoted or offered for sale in any way and there was no advertising connection with the webinar? No, absolutely, and Your Honor, we're uniquely positioned, if the court were to indulge in a pre-test analysis and go beyond the four corners of the facts and evaluate the presentation, we are uniquely positioned, or the court is uniquely positioned, to evaluate the content of that presentation. There is a full transcript of the presentation itself, which is available at Appendix 127, as well as the slide deck that was presented, and it is very clear, both from the transcript, the words that were actually presented during the webinar, and the deck themselves, there was no discussion of Millennium goods or services. And as Judge Krause pointed out earlier, there was absolutely no follow-up of any kind with respect to anyone who received the facts, registered for the webinar, or actually attended the webinar for any purpose, including to promote any Millennium goods or services. Now, if the webinar, however, turned out to be free, but then turned out to hype and promote Millennium's products a lot, would that be a TCPA violation? Coincidentally, it didn't do that, according to the record sites you provided, but if it did, is that a TCPA violation? Judge Streps, as you point out, that's not the case, but even if it were, if the court were to look just to the words used in the statute, no. The statute talks about the material transmitted and whether or not that offers any product or service for commercial availability. That's keying the advertisement to the ink that is printed on the facts paper, not anything that goes beyond. The court would have to look at the FCC's discussion in this 2006 order around pre-tax and free seminars that are really kind of on a timeshare type model where you're offered something for free and you show up and it's a sales pitch. This was not a sales pitch in this case. This was simply an education presentation, but even if it were, the court would have to go beyond the text of the statute and accept the FCC interpretation to get there. If we look to even the face of the statute, it does have a company's name and it makes reference to even a category of products where that company also does business. Why don't we have what is just per se a jury question, whether we're looking at it from a reasonable recipient's position or intent of the sender, where there needs to be an assessment of the context and the meaning that would be derived from that document? Because under this court's cases, that's not a jury question. It's a matter of law and whether the court were to apply the Optum test or, as you referenced earlier, the FishBuy test, no reasonable jury could conclude that this is an advertisement based on whether it objectively intended to influence a purchasing decision or if a reasonable recipient could conclude that there was an opportunity for a sale. The facts on its face and in context does not offer anything for sale. The district court rightly pointed out there is no commercial element whatsoever to this particular communication. But if we are using a sender test, and that's a little easier to say as a matter of law, looking at it from a recipient's perspective, and what would a reasonable recipient understand from the document, and courts make those kinds of assessments. But if what we're looking at is the sender test, if we're looking at what was the intent of a sender in sending this, isn't intent something that is typically a question for the jury? Not in this context and not under this court's cases and others. Courts have largely resolved these as a matter of law on summary judgment. But here, there wouldn't even be evidence to go to a jury. The record is undisputed and as a matter of law, this fact is not an advertisement. The concern with the approach of leaving this in the hands of the jury really gets to what this court has expressed its concern for with the pretext theory. Because you are leaving in the hands of a jury down the road long after a communication was sent, the decision of whether to impose crushing TCPA liability. And it puts companies like Millennium and many others in a position where they cannot predict whether a communication will be deemed an advertisement long after the fact in a court in the hands of a jury, which inevitably will chill speech that this court has held is permissible under the TCPA and also protected by the First Amendment. Supposing, let's say Elon Musk wants to do a program on safe driving, but in each offering of the program at the top, let's say the left-hand corner, you see Tesla show up every time. Now, the motive and the purpose is safe driving, but it also includes an advertising. Why would that get through or not? Well, to be clear, that's not this case. But I think, modulating the analogy a little bit, it would be more apt to say if Tesla had put on a presentation on climate change and there was reference to electric vehicles being one way everyday consumers can address climate change. Because the educational presentation here was on a public health topic of incredible importance. Before COVID and we were all sent to the Zoom matrix, the opioid crisis in this country was the leading public health issue. And so the way it's not, it's... I wanted you to respond. Millennium does show up in this program, does it not? I'm sorry, Your Honor? Millennium. Millennium does appear in the program. As a logo, yes. Yes. Well, that's why I made the comparison to Tesla showing up in Elon Musk's program. Why isn't that advertising? If it's just a generalized presentation on safe driving techniques, I don't think that's an advertisement for electric vehicles because there needs to be some commercial nexus. And the cases that have discussed the pretext theory and accepted it have also cautioned about communications where there may be some remote or latent downstream economic impact absent some close commercial nexus between the presentation and a commercially available product or service. And in fact, this court in Optum has offered similar caution, noting that all commercial entities at the end of the day operate from some profit motive, but that's not sufficient to turn any kind of communication from them into a prohibited fax. Mr. Warner, Section 227A4 of the TCPA, so a nearby provision of the TCPA, there's a definition of solicitation as the initiation of a telephone call for the purpose of encouraging the purchase or rental of or investment in property, goods, or services. Does that give us any insight into how we should read the definition of advertising, which also is referring to property, goods, or services, and specifically whether we should look at that from the perspective of the intent of the sender or that of a reasonable recipient? I think it's appropriate to look from the perspective of the sender. And yes, of course, the solicitation definition is relevant, but it's tied to goods or products that are commercially available. That's really the touchstone of the TCPA definition and the prohibition. And here, again, as the district court found, there's simply nothing that was commercially available. There was no commercial element to the fact. So I think solicitation, yes, is valuable, but needs to be understood in the broader context around the commercial availability of goods or services. Well, this language uses the purpose of. The purpose of language is obviously missing from the definition of advertisement that we were looking at. And again, that could make a difference here. You've made the case for educating the public about a very serious health crisis. But at the same time, when companies opt to do that, their mediated purpose and here, which has been initiated by the marketing department, as I understand it, that this will benefit the company economically in the long run. It will produce sales, whether because it's associated with the products or just general goodwill of the company. So if we are looking for advertisements from the sender's perspective, if we're really looking to general purpose, then even advertising for a free seminar like this might seem to fall under the definition. No, no, this court's case is often, and I have made clear that that kind of generalized goodwill or brand building a reputation is not enough to trigger TCPA liability. No, that's not an advertisement because Goodyear doesn't sell blunts. It's just a picture of a blunt. It's not offering anything for sale. How about touting the quality of a certain category of products that that company sells? I'm not aware of any case that has adopted that kind of rationale. And again, to indulge that line of analysis, the court would have to accept the pretext theory as well. Well, not necessarily, because this one isn't talking about referring an advertisement for a fax that's giving notice about a seminar and then looking to something down the line. This could be on the face of a fax itself that is touting the quality of a category of product. And as I read the appellant's brief here, that is a species of, it's one of their theories of liability, that this is understood to relate to a category of products, even if it doesn't use the name of the particular product that the client sells. Is there any case out there that says that the TCPA does not cover categories of products when it talks about the quality, for example, of goods or products? Why can't that be the category rather than a particular? Because it needs to have some more specific commercial nexus to something that's commercially available. Generally referencing a product that may be available in the context of a much broader discussion around an educational, public health issue is not enough under this court's cases. And I would point, Your Honor, to the NIA case where the court specifically noted that the knowledge of the sender is not sufficient to convert an ad into an informational fax into an advertisement. And that seems to be the logic that Mr. Bach argued on brief and is arguing here today and the logic that would need to be accepted to get there in this case. I was trying to figure out where to draw the line, Mr. Werner, and I think you might have just mentioned it. If you include the commercial availability of a product or a commercial nexus, then that runs afoul. But other than that, you're pretty much safe. Is that fairly accurate? Yes, and that's consistent with this court's cases, the cases that were cited on brief by both sides, and also the text and purpose of the statute. After all, Congress didn't target all communications from all commercial entities. It targeted a narrow species of fax communication that were advertisements that are defined as offering products that are commercially available for sale. I mean, is the TCPA's Commerce Clause legislation? Yes. Or does some other enumerated power? Judge, first, it's my understanding that it's under the Commerce Clause. So could Congress even have the power to prohibit faxes for free educational events? I mean, is that even within the scope of the Commerce power? No, I don't think it is, and it would also run afoul of the First Amendment. And that's why Congress has carved out, in certain sections, free communications, including communications from the government. So we have to read the TCPA as founded, at some level, by the Commerce Clause. It's enabling clause legislation. And if we were to give the statutory text a meaning beyond the enumerated power under which it was enacted, then that would be an unconstitutional reading. I agree with that, Your Honor. I'm just thinking out loud. That's all I'm doing. I'm happy to answer any further questions from the court. If there are no further questions, we ask the court to affirm the disreport. Thank you. Thank you, Mr. Warner. Mr. Brock, you have the floor. One final point, and something we made in the briefs, was that this concept that education and advertising are different is a false dichotomy. And this company, in particular, sent their education ambassadors to doctor offices to hand out this brochure, and the education ambassadors are select people in the sales department. So the point was to educate doctors about the value of medication monitoring that Millennium sells, and the webinar talks about why you should use the product Millennium sells versus other products. And then it tells the doctor how to justify the medical necessity to an insurance company to get the test paid for. The nexus between the facts and purchasing Millennium's service is a lot closer than the nexus between this fact and solving the opioid crisis. This webinar wasn't solving the opioid crisis. This is about testing workers who have workers' compensation claims to see if they're using the drugs that's prescribed and to get paid for doing the test that you buy from Millennium. Mr. Brock, we have not, to this point, adopted a pretext theory. A couple of our sister circuits have. But in those circuits, the downstream communication that gave rise to the claim of pretext involved advertising about a particular product of the company. And here, if you agree with Mr. Werner's characterization of the record, that is that the notes were not distributed to those in attendance, and that the image of any particular product was not associated with the webinar at the time, but it's something that was on the website some years later, then aren't you asking us not only to adopt a pretext theory, but to take it far beyond what either of our sister circuits has done? No, I don't think so. No, because this, you know, unlike the seminar at issue in Bollinger, that was just a company that sponsored the seminar and they weren't there. This company sponsored the seminar, put on the seminar, the person who spoke at the seminar. Their job is to tell people how to use their products. The seminar contrasted their products to other products. They don't mention the product by name, but that requirement isn't in the statute. You know, this is an invitation to a timeshare where you get there and they say that it's really a good idea to get involved in some kind of a vacation model or whatever, but they don't actually tell you which one. I guess if you ask them, hey, do you know somebody who sells that, they're going to say, yeah, good news, we do. This company sent it to people who already knew what they did, and they're trying to get more business out of them through a different category or through convincing them that they should be using this and how to get paid from insurance companies. It's not such a stretch of the pretext theory to think that a free webinar about the product they sell and the benefits of it is an attempt to sell it. When in fact, that is what they were trying to do is increase the use of their products. What boundary is there then on a pretext theory? If there's a facsimile that's sent by a company that says, save the sea lions, and it includes on the company's website, it has, among other things, advertisements for the company's products. Is that facsimile with that communication going to be a violation of the TCPA in your view? No, I don't think so. I don't think so. That's a sponsorship as opposed to an advertisement. It has the reference to a website that sends the recipient to a different place that then has an advertisement. How is that really different than the situation that we're facing here? Because this isn't about saving the sea lions. This isn't about something that isn't what they sell. This is only about what they sell. If the company that says, save the sea lions, is also the company that sells whatever it is that you use to save the sea lions, that's an ad for saving the sea lions products. This is an ad for medical monitoring products. Obviously, this court's had several of these cases, so it's a facts-by-facts basis. We're not saying everything with a company logo on it is an advertisement, but this fact is an advertisement. And this webinar was an advertisement for their products, even though they don't mention the product name, which isn't even a memorable name. It's more the company that sells it. It's the Millennium product. How is it effectively an ad if the name of the product is not even mentioned? Well, Your Honor, the name of the product is Millennium. It's Millennium Urine Drug Test. Pardon me? So it's the drug test that you're saying that is the purpose of the facts, to sell a drug test. Right. They sell a urinary drug test. And this fact is about why you should use those when you're treating workers' comp patients. And the webinar is about why you would choose the test they sell versus other tests. But they don't say our test or the Millennium test. But the Millennium test doesn't have a name like Snickers bar or something like that. I don't think it has a brand name that they need to be waving around so that you know what they're talking about. They sell the drug test. It's Millennium UDT. Isn't that important from a buyer standpoint? To know what it is that you're buying, what you're paying for? Yes. Yeah, that's all true. That is true. I think all of the information in the webinar is more important to a doctor using their test than the name of the test. You know, they didn't send a fax that says, use the Millennium UDT. They sent a fax that says, use medical monitoring on your patients to see if they're using the drugs correctly. Okay, thank you. Thank you for the talk. Thank you, Mr. Warner, for your excellent arguments today. We will take the case of advisement. Thank you.